FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jul 16, 2026

SEAN F. McAVOY, CLERK

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DEBORAH E.,[1]<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | No.    2:26-cv-1-EFS<br><br>**ORDER REVERSING THE ALJ'S DENIAL OF BENEFITS, AND REMANDING FOR MORE PROCEEDINGS** |

Plaintiff Deborah E. asks the Court to reverse the Administrative Law Judge's (ALJ) nondisability decision due to an error at step two and when evaluating Plaintiff's symptom complaints. The Court agrees

---

[1] For privacy reasons, Plaintiff is referred to by first name and last initial or as "Plaintiff." See LCivR 5.2(c).

DISPOSITIVE ORDER - 1

the ALJ erred at step two and that this error requires a remand for further proceedings, including receiving testimony from a medical expert.

## I.    Background

Plaintiff's application, which was filed in April 2023, claims that she became disabled more than a decade before, beginning November 22, 2011, due to a brain meningioma tumor and physical pain and limitations in her neck, knee, and right shoulder.[2] To pursue her Title 2 claim, she attended a telephone hearing before ALJ Howard Prinsloo in August 2024, at which Plaintiff and a vocational expert testified.[3]

---

[2] Administrative Record (AR) 189–91. Plaintiff stated that she "brought this action to appeal the Defendant's administrative decision which denied plaintiff's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI)." ECF No. 9 at 1–2. However, Plaintiff only filed an application for DIB under Title 2, not an SSI application under Title 16. Therefore, Plaintiff must establish disability onset before her date last insured of December 31, 2011.

[3] AR 69–100.

DISPOSITIVE ORDER - 2

Plaintiff testified that she previously worked as a floral designer, but that the physical aspects of the job became too difficult, including lifting heavy buckets, stooping, cleaning out coolers, holding her arms at shoulder height when designing the floral arrangements, and standing, walking, or sitting for extended periods.[4] She stated that even following her prior multi-level fusion on her cervical spine in the early 2000s, she continued to have flare-ups of upper back, neck, and shoulder pain and muscle spasms, tingling or numbness in her hands, and headaches.[5] She testified that during the at-issue 2011 period, she had two "bad days" a week.[6] She said that she had pain in her right hand due to carpal tunnel and weakened grip strength; she had carpal tunnel release surgery on her right hand in 2016 and her left hand in 2021.[7] She shared that her right knee has "popped" since high school, her knee swells about 3–4 times a year, she wears a knee brace to help

[4] AR 74–75, 81.

[5] AR 75–77, 89.

[6] AR 89–90.

[7] AR 88, 569, 519.

DISPOSITIVE ORDER - 3

stabilize her knee, and she ices and elevates her knee as needed.[8] She has allergies for which she uses a nebulizer and inhaler.[9]

Due to pain and other symptoms, she testified that she would call out or leave early from work as a floral designer about once or twice a month.[10] She stopped working as a floral designer in 2006, but continued to assist with her husband's garage door company, primarily as the bookkeeper and, at the time of the hearing, she said she was only working about two hours a week.[11] She tried using ice packs on her neck to reduce pain, a practice she continues.[12] She continues to experience weakness and numbness in her hands and wrists.[13] She learned that her brain tumor contributed to her headaches, but even after the surgery in 2011 to remove the tumor, her neck pain and

---

[8] AR 79–80.

[9] AR 81–83.

[10] AR 77.

[11] AR 88, 94–95, 187.

[12] AR 77.

[13] AR 77.

DISPOSITIVE ORDER - 4

exposure to fumes still caused headaches.[14] To help reduce pain, she sought regular treatment from her primary doctor, saw specialists, has been on hydrocodone since 2003, and has had several surgeries.[15] She testified that her daily activities are limited: she only does light cooking, cleaning takes her a long time as she needs to rest, and she can slowly shower and get dressed.[16] When traveling long distances, she must stop about every 60 minutes to get out and walk around to alleviate the tingling in her legs, burning of her spine, and numbness in her arms.[17] She limits her standing to 30 minutes, tries to rotate positions often, and tries not to lift anything over 10–15 pounds.[18] She said that in 2011 she would spend about half the day in a reclining

[14] AR 83–84.

[15] AR 72, 77–79.

[16] AR 84.

[17] AR 85–86.

[18] AR 86–89, 92–93.

DISPOSITIVE ORDER - 5

position, and that now she has a limp due to foot issues and she can walk a block or two before needing to rest.[19]

The ALJ issued a decision finding Plaintiff not disabled.[20] The ALJ found Plaintiff's alleged symptoms were "not entirely consistent with" the evidence.[21] As to the medical opinions, the ALJ found the State agency physical consultants' findings that there was insufficient evidence to evaluate the claim during the relevant period not persuasive.[22] As to the sequential disability analysis, the ALJ found:

- Step one: Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 22, 2011, through her date last insured of December 31, 2011.

---

[19] AR 87.

[20] AR 35–51. Per 20 C.F.R. § 404.1520(a)–(g), a five-step evaluation determines whether a claimant is disabled.

[21] AR 42. As recommended by the Ninth Circuit in *Smartt v. Kijakazi*, the ALJ should consider replacing the phrase "not entirely consistent" with "inconsistent." 53 F.4th 489, 499, n.2 (9th Cir. 2022).

[22] AR 43.

DISPOSITIVE ORDER - 6

- Step two: Plaintiff had the medically determinable severe impairment of degenerative disc disease, status post cervical spine fusion.

- Step three: Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

- RFC: Plaintiff had the RFC to perform light work except she can occasionally balance, stoop, kneel, crawl, and climb, with occasional overhead reaching.

- Step four: Plaintiff could perform her past relevant work as a floral designer.

- Step five: Alternatively, considering Plaintiff's RFC, age, education, and work history, Plaintiff could perform work that existed in significant numbers in the national economy, such as router, collator operator, and merchandise marker.[23]

---

[23] AR 38–45.

DISPOSITIVE ORDER - 7

Plaintiff requested review of the ALJ's decision by the Appeals Council, which denied review.[24] Plaintiff now appeals to district court.[25]

## II.    Standard of Review

When considering the ALJ's findings, the court is constrained to the reasons and supporting explanation offered by the ALJ.[26] The ALJ's decision is reversed "only if it is not supported by substantial evidence or is based on legal error"[27] and such error impacted the nondisability determination.[28] Substantial evidence is "more than a

---

[24] AR 1–6.

[25] ECF No. 1.

[26] *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).

[27] *Hill v. Astrue*, 698 F.3d 1153, 1158 (9th Cir. 2012). *See* 42 U.S.C. § 405(g).

[28] *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012), *superseded on other grounds by* 20 C.F.R. § 416.920(a) (recognizing that the court may not reverse an ALJ decision due to a harmless error—one that "is inconsequential to the ultimate nondisability determination").

DISPOSITIVE ORDER - 8

mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[29]

### III.   Analysis

Plaintiff argues the ALJ erred by finding only one severe impairment related to her back/neck and when evaluating her symptom reports. In response, the Commissioner maintains that substantial evidence supports the ALJ's step-two findings, evaluation of Plaintiff's reported symptoms, and the RFC. As is explained below, the ALJ's step-two errors require a new evaluation on remand.

---

[29] *Hill*, 698 F.3d at 1159 (quoting *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997)). *See also Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (The court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion," not simply the evidence cited by the ALJ or the parties.) (cleaned up); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("An ALJ's failure to cite specific evidence does not indicate that such evidence was not considered[.]").

DISPOSITIVE ORDER - 9

**A.    Step Two (Severe Impairment): Plaintiff establishes consequential error.**

Plaintiff argues the ALJ erred at step two by failing to consider carpal tunnel syndrome, meningioma with post-surgical headaches, and chronic right shoulder conditions as severe impairments. In response, the Commissioner argues that, before the date last insured of December 31, 2011, these additional impairments were not "severe" and, regardless, the ALJ considered all the evidentiary supported functional limitations when crafting the RFC.

### 1.    Standard

At step two, the ALJ determines whether the claimant suffers from a "severe" impairment, i.e., one that significantly limits her physical or mental ability to do basic work activities.[30] This involves a two-step process: (1) determining whether the claimant has a medically determinable impairment, and (2) if so, determining whether the impairment is severe.[31]

---

[30] 20 C.F.R. § 404.1520(c).

[31] *Id.* § 404.1520(a)(4)(ii).

DISPOSITIVE ORDER - 10

As to the first prong, "a physical or mental impairment must be established by objective medical evidence from an acceptable medical source."[32] Evidence obtained from the "application of a medically acceptable clinical diagnostic technique, such as evidence of reduced joint motion, muscle spasm, sensory deficits, or motor disruption" is considered objective medical evidence.[33] If the objective medical signs and laboratory findings demonstrate the claimant has a medically determinable impairment,[34] the ALJ must then determine whether that impairment is severe.[35]

As to the severity prong, the medical evidence must establish that the impairment would have more than a minimal effect on the

---

[32] *Id.* § 404.1521. *See also* Soc. Sec. Rlg. (SSR) 85-28: Titles II and XVI: Medical Impairments That Are Not Severe.

[33] 3 Soc. Sec. Law & Prac. § 36:25, Consideration of objective medical evidence (2026). *See also* 20 C.F.R. § 404.1502(f).

[34] 20 C.F.R. § 404.1502(g) (defining "signs"). *See also id.* § 404.1502(c) (identifying medical imaging as diagnostic techniques).

[35] SSR 85-28.

DISPOSITIVE ORDER - 11

claimant's ability to work.[36] Because step two is simply to screen out weak claims,[37] "[g]reat care should be exercised in applying the not severe impairment concept."[38]

Further, for Title 2 claims, the claimant must establish that the onset date of disability is before the date last insured.[39] Evidence that both predates and postdates the date last insured is considered in this assessment if the evidence is relevant to the impairment prior to the

---

[36] *Id.*

[37] *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).

[38] SSR 85-28. *See also Buck v. Berryhill*, 869 F.3d 1040, 1048–49 (9th Cir. 2017).

[39] *Wellington v. Berryhill*, 878 F.3d 867, 872 (9th Cir. 2017) ("A claimant can qualify for [disability insurance benefits] only if her disability begins by her date last insured . . . ."); SSR 18-1p: Titles II and XVI: Determining the Established Onset Date in Disability Claims.

DISPOSITIVE ORDER - 12

date last insured.[40] Non-medical evidence can be relevant to determining the onset date of a medically-established impairment.[41]

### 2. ALJ's Findings

The ALJ found Plaintiff had only the severe impairment of degenerative disc disease, status post cervical spine fusion, because the other physical impairments of record "occurred only sporadically; were acute or transient; appear to have resolved; were responsive to treatment; or did not otherwise cause more than minimal workplace

---

[40] *See* SSR 18-1p; *Jones v. Saul*, 823 F. App'x 434, 439 (7th Cir. Aug. 31, 2020) (considering medical evidence post-dating the date last insured); *Foreman v. Comm'r of Soc. Sec. Admin.*, No. CV-22-08116-PCT-SPL, 2023 WL 3247008, at *3 (D. Ariz. May 4, 2023) (finding the ALJ erred by not considering the testing that occurred about five years after the date last insured).

[41] *See Flaten v. Sec'y of Health & Hum. Servs.*, 44 F.3d 1453, 1461 n.5 (9th Cir. 1995) ([T]estimony from family, friends, and neighbors [is] . . . relevant to the determination of a continuously existing disability with onset prior to expiration of insured status.").

DISPOSITIVE ORDER - 13

limitations through the date last insured."[42] The ALJ stated that he "considered all of the claimant's allegations and impairments in his assessment of the claimant's residual functional capacity,"[43] which permitted light work with occasional balancing, stooping, kneeling, crawling, climbing, and overhead reaching.[44] The ALJ's decision did not mention headaches, Plaintiff's reported difficulty with fumes, or carpal tunnel, although the ALJ did list meningioma and "difficulty with handling and fingering" as reported difficulties by Plaintiff.[45]

### 3. Analysis

The objective medical findings, including imaging, both before and after the date last insured, reveal that the ALJ's step-two findings and resulting RFC are not supported by substantial evidence and that medical expert testimony is needed to shed light on the severity of Plaintiff's impairments during the relevant period.

---

[42] AR 40–41.

[43] AR 41.

[44] AR 41.

[45] AR 42.

A brief review of some of the longitudinal medical records highlights that treating providers and specialists were still investigating, after the date last insured, the cause of Plaintiff's reported symptoms. For instance, at a treatment appointment in September 2008, Plaintiff reported right arm numbness and tingling in her deltoid region with pain radiating to her fingers, a weak grip at times, and pain in the lower part of her neck on extension.[46] She was observed with mild tenderness posteriorly in her neck.[47] Dr. Jonathan Carlson diagnosed her with recurrent cervical radiculopathy on the right, primarily in C7 but also in C5 and C6, along with a broken cervical screw sitting in her soft tissue from her C4–7 fusion.[48] In October 2010, Plaintiff continued to report muscle aching in the right paraspinal neck region that radiated into the shoulder, along with carpal tunnel symptoms in the right hand.[49] Dr. Carlson concluded

---

[46] AR 774.

[47] AR 775.

[48] AR 776–77, 2773.

[49] AR 773.

DISPOSITIVE ORDER - 15

that she likely had carpal tunnel syndrome in her right hand, along with pseudoarthrosis at C6–7.[50]

A year later, in October 2011, Plaintiff again saw Dr. Carlson for worsening neck pain, right shoulder pain, tingling and numbness in her right hand.[51] Dr. Carlson observed significant tenderness of the acromioclavicular joint, some lateral impingement, cervical spine focal tenderness, subtly diminished right grasp, and low reflexes in upper and lower extremities.[52] Dr. Carlson concluded that Plaintiff:

> Has a combination [of] several different problems going on. Most likely there is some shoulder issue either an impingement or may be a rotator cuff tear. I'm going to work this up with an MRI scan and referral to physiatry.
>
> Her description of right arm or leg chest and face sensory change is indicative of a central nervous system issue. I would like to get an MRI scan of her brain to rule out a tumor or prior stroke.
>
> Her neck spasm symptoms are related to spondylosis. Probably the treatment for this will be some physical therapy and possibly some cortisone injections. It doesn't seem like [her] C3–4 disc is symptomatic for her radicular

---

[50] AR 773.

[51] AR 772–73.

[52] AR 772.

perspective, and I don't detect any myelopathy on her examination.[53]

The ordered brain scan showed a right cerebellar pontine angle tumor, which was later determined to be meningioma.[54] Two weeks after her appointment with Dr. Carlson, Plaintiff again saw him and he noted that the tumor would not be the cause for the "slightly numb paresthetic perception that's been there for many years," and he referred her to Dr. Sandhu for her right shoulder pain and limitations and extremity sensory loss.[55] Later that same day, Plaintiff saw Dr. Sandhu.[56] Dr. Sandhu observed her with diffuse neck tenderness over the spinous processes, paraspinals, and trapezius area, and her right shoulder. Her right shoulder range of motion was limited with forward flexion, abduction, external rotation. Her Speeds and Apprehension tests were positive, handgrip slightly reduced on her

---

[53] AR 772.

[54] AR 1745–47.

[55] AR 767.

[56] AR 769–71.

DISPOSITIVE ORDER - 17

right side, and her sensation was diminished in the median nerve distribution, on the right more than left.[57] Dr. Sandhu determined that the etiology of Plaintiff's right shoulder pain was unclear but suspected that it may be due to impingement or specific rotator cuff pathology and that she did have symptoms and signs of bicep tendinitis.[58] The ordered MRI revealed:

> 1. Moderate infraspinatus and mild supraspinatus/subscapularis tendinosis
> 2. Focal "rim rent" tear anterior marginal insertion supraspinatus
> 3. AC Joint: Moderate osseous hypertrophic changes with small joint effusion, subchondral bone marrow edema and minimal inferior spurring with mechanical deformity.[59]

A month later, on the alleged disability onset date of November 22, 2011, surgery was conducted to remove the right cerebellar pontine angle tumor (meningioma).[60] An MRI the next day revealed the surgical changes, along with "small areas of restricted diffusion within

---

[57] AR 770.

[58] AR 770.

[59] AR 771.

[60] AR 1470–71.

the posterior and lateral right cerebellar hemisphere [which] may represent small areas of refraction" and mild white matter disease in the hemispheres.[61] At her post-op appointments in December 2011 for her meningioma, Dr. Carlson observed Plaintiff with sensory abnormalities related to the occipital nerves.[62]

Following her date last insured of December 31, 2011, Plaintiff had follow-ups for the meningioma, during which she reported continued occasional headaches and neuropathic occipital nerve pain.[63] In December 2012, Plaintiff returned to Dr. Sandhu for her right shoulder pain, which had returned after the physical therapy that he had recommended.[64] She again reported her shoulder pain worsened with overhead activities and abduction, right hand intermittent numbness in the median distribution even though she wore a carpal

---

[61] AR 1741–42.

[62] AR 765.

[63] AR 761–63.

[64] AR 759–60.

DISPOSITIVE ORDER - 19

tunnel brace at night, and numbness on the right side of her body.[65] Dr. Sandhu observed her with limited neck motion and right shoulder motion, including extension and forward flexion, with pain observed with slow flexion, slightly weak handgrip on the right, and diffuse numbness at the right upper extremity.[66] Dr. Sandhu again suspected that Plaintiff's right shoulder pain was due to rotator cuff tendinitis. He recommended resting her shoulder as much as possible along with another course of physical therapy and if physical therapy did not provide adequate improvement then he would refer her to orthopedic. Dr. Sandhu reviewed a 2008 NCS/EMG study of her bilateral upper extremities which showed "some slowing without denervation."[67] He ordered a new EMG study.

Plaintiff underwent physical therapy for her shoulder and then saw Dr. Sandhu in February 2013, reporting that her shoulder was doing better but that she was still bothered with overhead motions;

---

[65] AR 760.

[66] AR 760.

[67] AR 760.

DISPOSITIVE ORDER - 20

improved shoulder range of motion was observed but extension was still limited.[68] Dr. Sandhu encouraged Plaintiff to continue with her home exercises. The nerve conduction and electromyography studies were abnormal and consistent with bilateral sensorimotor median neuropathy at the level of the wrist with chronic denervation-innervation changes.[69]

Later that month, Plaintiff saw orthopedic surgeon Henry Lin, MD, for her "10-year history of right-hand numbness. Progressively worsening."[70] Dr. Lin observed some mild swelling in the entire right hand and positive Tinel's, carpal compression, and Phalen's tests. He noted that the nerve study confirmed bilateral carpal tunnel syndrome with the right side more symptomatic.[71] Plaintiff continued to seek

---

[68] AR 758.

[69] AR 759.

[70] AR 570.

[71] AR 571.

treatment for shoulder and hand symptoms and had tenderness near her meningioma-surgery incision sight.[72]

On this record, the ALJ's brief step-two findings fail to adequately explain why carpal tunnel syndrome, meningioma with post-surgical headaches, and chronic right shoulder conditions were not severe impairments. These conditions were neither acute nor transient, nor did they resolve within 12 months of being reported or

---

[72] *See, e.g.*, AR 2967 (June 2014: tenderness near incision sight); AR 393–94 (May 2015: still reporting electrical shock sensation near her incision site); AR 715, 974 (July 2016: doctor does not have any recommendations for the headaches that Plaintiff has continued to have since her meningioma surgery); AR 569 (Sept. 2016: carpal tunnel release surgery on right hand); AR 690–92 (Aug. 2018: reporting right occipital headaches with aura); AR 655 (reporting more right shoulder and hand pain and observed with tenderness and tightness and reduced abduction).

observed, nor did they fully respond to treatment within 12 months.[73] The objective medical evidence, including the 2008 EMG study, shows that Plaintiff's carpal tunnel existed before December 31, 2011. Likewise, Plaintiff's right shoulder pain and limitations were observed before the date last insured, and the October 2011 MRI confirmed impairments beyond degenerative disc disease impacting Plaintiff's right shoulder. The medical record reveals that Plaintiff's shoulder conditions continued to limit her ability to fully use her right arm and cause pain, particularly with extension, lifting, and reaching overhead. Furthermore, the medical record reflects that Plaintiff's symptoms related to meningioma were not transitory nor fully resolved after the tumor was removed in November 2011, as Plaintiff continued to be observed with sensory abnormalities related to the occipital nerve.[74]

---

[73] *See* 20 C.F.R. §§ 404.1505(a), 404.1509 (requiring the impairment to have lasted or be expected to last for a continuous period of not less than 12 months).

[74] AR 761, 765–68.

DISPOSITIVE ORDER - 23

Finally, the ALJ's step-two analysis—and decision as a whole—fails to meaningfully explain how limiting Plaintiff to light work, which requires lifting 20 pounds or frequent lifting or carrying of objects weighing 10 pounds,[75] along with occasional overhead reaching, sufficiently accommodates Plaintiff's limitations related to carpal tunnel syndrome, her right shoulder impairments, and her post-surgery meningioma.

**B.    Remand: further proceedings**

Due to the ALJ's step-two errors, Plaintiff's remaining arguments need not be addressed, and this matter is remanded for further proceedings.

On remand, the ALJ is to develop the record, including receiving testimony from a medical expert, and reevaluate—with meaningful articulation and evidentiary support—the sequential process. The medical expert is to review the record and offer an opinion as to what severe impairments Plaintiff had by the date last insured and the

---

[75] 20 C.F.R. § 404.1567(b).

DISPOSITIVE ORDER - 24

resulting limitations.[76] If the ALJ discounts Plaintiff's reported symptoms, the ALJ must articulate clear and convincing reasons for discounting the identified symptoms and cite the evidence that undermines the symptoms.[77] The ALJ must ensure that the examples he relies on are relevant to the underlying medical condition and fairly represent the record as a whole.[78] Further, if necessary, the ALJ must

---

[76] *See Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2018); SSR 18-1p (allowing for a medical expert to testify as to disability onset date). *See also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (recognizing that as a lay person, the ALJ is "simply not qualified to interpret raw medical data in functional terms").

[77] *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014).

[78] *Ortiz v. Bisignano*, --- F.4th ----, 2025 WL 4947035 (9th Cir. June 24, 2026) (recognizing that certain impairments can cause chronic pain even though muscle strength, sensory functions, and reflexes are normal); *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014) ("While ALJs obviously must rely on examples . . . the data points they choose must in fact constitute examples of a broader development . . . .").

also consider how Plaintiff's activities with the family's garage door company shifted given both her physical conditions and her husband's stroke and the timing of such and how such physically impacted her.[79]

_____

[79] *See* AR 775 (Sept. 2008: "bookkeeper; she also helps her husband install garage doors"); AR 769 (Oct. 2011: noting "[s]he helps her husband with . . . garage door installations, a business which they own together. States she does most of the ground level work while husband does more of the overhead and ladder work"); AR 760 (Dec. 2012: "She functions as a bookkeeper for the most part"); AR 1460 (March 2015: "bookkeeper for her family's business"); AR 645 (March 2020: "She reports working performing bookkeeping activities for her family small business"); AR 638 (Oct. 2020: needing to do more of her husband's tasks due to his stroke but the work is aggravating her neck, shoulder, and hands); AR 630, 704–05, 935, 1313–19 (April–July 2020: same); AR 965–66 (Oct. 2021: following the C2–3 anterior fusion two months prior, she reports helping as the bookkeeper); AR 871–72 (Aug. 2022: noting performing "usual duties as a office manager" but had to take

## IV.    Conclusion

Plaintiff established the ALJ erred. Accordingly, **IT IS HEREBY ORDERED**:

1.    The ALJ's nondisability decision is **REVERSED, and this matter is REMANDED to the Commissioner of Social Security for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g)**.

2.    The Clerk's Office shall **TERM** the parties' motions/briefs, **ECF Nos. 9 and 10**, enter **JUDGMENT** in favor of **Plaintiff**, and **CLOSE** the case.

IT IS SO ORDERED. The Clerk's Office is directed to file this order and provide copies to all counsel.

DATED this 16th day of July 2026.

*Edward F. Shea*
_____
EDWARD F. SHEA
Senior United States District Judge

time off due to difficulty with her arm); AR 88, 94 (Aug. 2024: testifying that she works as a bookkeeper for only two hours a week).

DISPOSITIVE ORDER - 27